UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

R.L., a minor child,

           Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

           Defendant.

CASE NO.     C08-5536RBL-KLS

REPORT AND
RECOMMENDATION

Noted for May 15, 2009

      Plaintiff, R.L., a minor, has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Court's review.

FACTUAL AND PROCEDURAL HISTORY

      Plaintiff currently is 10 years old.[1] Tr. 31. He has no past work experience. Tr. 28. Plaintiff,

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

1  through his mother, protectively filed an application for SSI benefits on July 17, 1998, alleging disability

2  as of June 28, 1998, due to critical aortic stenosis. Tr. 31, 129-32, 134.  On October 10, 1998, he was

3  found disabled pursuant to section 104.07B of 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B. Tr. 18,

4  31.  On April 15, 2003, however, plaintiff was found to be no longer disabled. Tr. 18, 32, 34.  That

5  decision was affirmed on reconsideration on February 13, 2004. Tr. 33, 55-61

6          Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on May

7  4, 2006, but which was discontinued due to an issue concerning the appointment of plaintiff's

8  representation. Tr. 392-97.  A second hearing was held on August 2, 2006, at which plaintiff, represented

9  by legal counsel, appeared but did not testify. Tr. 398-433.  Plaintiff's mother and grandmother appeared

10  as well, and both testified on behalf of plaintiff. Id.  On November 21, 2006, the ALJ issued a decision

11  determining plaintiff to be not disabled as of April 15, 2003, finding in relevant part as follows:

12          (1)     at the time of his most favorable medical decision, plaintiff's cardiac condition
                    was found to meet the criteria of Listing 104.07B and Listing 104.06H;
13
        (2)     by April 15, 2003, plaintiff had experienced an improvement in his cardiac
14                  condition;

15          (3)     plaintiff's cardiac condition, which was present on October 10, 1998, did not
                    currently meet or medically or functionally equal the criteria of either Listing
16                  104.07B or Listing 104.06H;

17          (4)     plaintiff had never engaged in substantial gainful activity; and

18          (5)     since April 15, 2003, plaintiff continued to have a cardiac condition that was a
                    "severe" impairment, but which did not meet or medically or functionally equal
19                  the criteria of any of those contained in the Listings.

20  Tr. 18-29.  Plaintiff's request for review was denied by the Appeals Council on July 3, 2008, making the

21  ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

22          On September 4, 2008, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's

23  decision. (Dkt. #1).  The administrative record was filed with the Court on November 21, 2008. (Dkt. #8).

24  Plaintiff argues the ALJ's decision should be reversed and remanded for a reinstatement of benefits or, in

25  the alternative, for further administrative proceedings, because the ALJ erred in not finding his congenital

26  heart disease and/or chronic heart failure met or functionally equaled the Listings criteria.  The

27  undersigned disagrees that the ALJ erred in determining plaintiff to be not disabled, and, for the reasons

28  set forth below, recommends that the ALJ's decision be affirmed.

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.    <u>Standards of Review for Determining a Minor Claimant's Eligibility for SSI Benefits</u>

    A.    <u>Sequential Evaluation Process</u>

For a claimant who is under the age of 18, the Commissioner will consider that claimant disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. To be disabled, therefore, the impairment or combination of impairments must be medically determinable, that is they "must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.927(a)(1).

Notwithstanding the presence of a medically determinable impairment, however, if the claimant is engaging in "substantial gainful activity," he or she will not be found disabled. 20 C.F.R. §§ 416.906, 416.924(a). At step one of the sequential evaluation process, therefore, the Commissioner must determine whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If the claimant is not engaging in such activity, the Commissioner then moves on to step two of the evaluation process. 20 C.F.R. § 416.924(a).

At step two of that process, the Commissioner must consider whether the claimant has a "severe" impairment. 20 C.F.R. § 416.924(a), (c). An impairment is not severe if it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. §

416.924(c).  If the impairment is severe, then, at step three, the Commissioner must determine whether it "meets, medically equals, or functionally equals" any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R. § 416.924(a), (d).  If the claimant has such an impairment, and it "meets the duration requirement" noted above, disability will be found. 20 C.F.R. § 416.924(a).

In determining whether a minor claimant is disabled, the Commissioner will consider "all of the relevant evidence" in the record, including information from medical and other sources, such as therapists, parents, teachers and other people the claimant knows. 20 C.F.R. § 416.924a(a).  The Commissioner thus "will not consider any single piece of evidence in isolation" or "rely on test scores alone." 20 C.F.R. § 416.924a(a)(1)(ii).  In evaluating the ability to function, the Commissioner looks at whether the claimant can do the activities other children the claimant's age can do, how well the claimant does those activities, and how much help is needed from family, teachers or others. 20 C.F.R. § 416.924a(b)(2)(i).

    B.    Continuing Disability Review

If a claimant is "eligible for disability benefits as a disabled child," his or her "continued eligibility for such benefits must be reviewed periodically." 20 C.F.R. § 416.994a(a).  In conducting that review, the Commissioner first considers whether "medical improvement" has occurred in the claimant's impairments. 20 C.F.R. § 416.994a(a)(1).  "Medical improvement" is defined as "any decrease in the medical severity" of the claimant's "impairment(s) which was present at the time of the most recent favorable decision" – which involved "a consideration of the medical evidence" in the record – that he or she was "disabled or continued to be disabled." 20 C.F.R. § 416.994a(c)(1).  Any such "decrease in medical severity must be based on changes," i.e., improvement, "in the symptoms, signs or laboratory findings associated" with the claimant's impairment or impairments. 20 C.F.R. § 416.994a(c).

If there has been no medical improvement, a claimant's disability will be found to continue, unless certain exceptions thereto apply.[2] 20 C.F.R. § 416.994a(a)(1).  If medical improvement has occurred, the

_____

[2]There are two groups of exceptions to this medical improvement requirement.  Under the first group of exceptions, a claimant will be found to no longer be disabled if the substantial evidence in the record (1) "shows that, based on new or improved techniques or evaluations," the claimant's "impairment(s) is not as disabling as it was considered to be at the time of the most recent favorable decision," or (2) "demonstrates that any prior disability decision was in error." 20 C.F.R. § 416.994a(e)(1), (2).  Under the second such group, the following exceptions may result in a determination that the claimant is no longer disabled: (a) "[a] prior determination or decision was fraudulently obtained"; (b) the claimant does not cooperate in the determination as to, or cannot be found during the course of determining, whether he or she continues to be disabled; and (c) the claimant fails "to follow prescribed treatment which would be expected to improve" his or her "impairment(s) so it no longer results in marked and severe functional limitations." 20 C.F.R. § 416.994a(f).

Commissioner considers whether the impairment or impairments the claimant had at the time of the most recent favorable decision "now meets or medically or functionally equals the severity of the listing it met or equalled at that time." Id. If so, the claimant will be found disabled, again unless one of the exceptions set forth in subsection (e) or (f) of 20 C.F.R. § 416.994a apply. If not, the Commissioner will determine if the claimant is currently disabled – i.e., has a severe impairment that meets or medically or functionally equals any of those set forth in the Listings. See 20 C.F.R. § 416.924; 20 C.F.R. § 416.994a(a)(1), (b).

II.   The ALJ Did Not Err in Finding Plaintiff's Cardiac Condition Did Not Meet or Medically Equal Any of the Impairments Contained in the Listings

As noted above, at step three of the sequential disability evaluation process, the ALJ is required to evaluate the claimant's impairment or impairments to see if they meet, medically equal, or are functionally equivalent to any of those listed in the Listings. 20 C.F.R §§ 416.924(a). The Listings consist of two parts: "Part A," which "contains medical criteria that apply to adult persons age 18 and over," and "Part B," which "contains additional medical criteria that apply only to the evaluation of impairments of persons under age 18." 20 C.F.R. § 416.925(b).

To determine whether a minor claimant has an impairment or impairments that meet any of those contained in the Listings, therefore, Part B is used first. Id. If the medical criteria in Part B do not apply, then the medical criteria in Part A are used. Id. With respect to Part B, "'listing-level severity' generally means . . . 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." Id. Six such "domains" are considered in determining listing-level severity, which are as follows: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for" oneself; "and (vi) [h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1).

A claimant's impairment or impairments are deemed "medically equivalent" to an impairment in the Listings, "if the medical findings are at least equal in severity and duration" to the listed impairment. 20 C.F.R. § 416.926(a). In making this determination, the Commissioner compares "the symptoms, signs, and laboratory findings" about the claimant's impairment or impairments with "the corresponding medical criteria" for the listed impairment or impairments. Id. If the claimant's impairment or impairments are not described in the Listings, the Commissioner compares the medical evidence in the record with the criteria "for closely analogous listed impairments" to see if that evidence is "at least of equal medical significance

to" the listed criteria. 20 C.F.R. § 416.926(a)(2). Medical equivalence, however, must be based only on the medical evidence in the record, which must "be supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.926(b).

In this case, the ALJ found in relevant part as follows:

I adopt the State Agency physician consultant's assessment that the claimant's cardiac condition, (which is the condition the claimant had at the time of the comparison disability point [October 10, 1998]) does not meet or [medically] equal the cardiac listings in effect when he was found disabled (8F). On October 10, 1998, the claimant was found to meet children's listings 104.07B and 104.06H as they then existed under Appendix 1, Subpart P, Regulations No. 4. 1[0]4.07B required critical aortic stenosis in a newborn and 104.06H stated that an infant that has had surgery in the first 12 months of life was to be considered disabled until the age of one year or for 12 months, whichever is later; thereafter to be evaluated under 104.02 to 104.08 (3F). The claimant is no longer a newborn, 104.07B does not apply. (104.07B no longer exists as a listing, Federal Register, January 13, 2006, Volume 71, Number 9 explains that, due to treatment improvements, newborn aortic stenosis is not usually expected to be at lifting [sic] level severity for twelve months.) While listing 104.06H cannot directly apply as the time periods in it are up, the listings it referred to for after those time periods have been considered as they existed at the comparison point of decision in 1998. I find that none of them (listings 1[0]4.02 to 1[0]4.08) have been met or equaled since at least April 15, 2003. In December 2002, the child's cardiac status was found as a somewhat hypolastic aortic valve annulus with mild . . . right ventricular outflow tract obstruction, moderate aortic insufficiency and mild right ventricular enlargement with good ventricular contractability. There was no evidence of left ventricular hypertrophy of dilation and the left ventricular contractability was good (10 F8). Status in June 2005 was basically the same (moderate pulmonary allograft stenosis with moderate insufficiency, mild to moderate neoartic insufficiency, mild right ventricular dilation and normal left ventricular size and function) (12F25). His only symptoms since at least April 15, 2003 have been exertional. Looking at listings from 104.02 to 104.08 as they existed in 1998, his exertional problems are not that of increased hypoxemia on exertion required for 104.06A4 nor is his exercise intolerance at the marked level as required in 104.02. There is no question that the child has a long term cardiac condition that requires heart medications and will require future surgery, although the heart medications are expected to slow progression of his condition to forestall surgery, his condition does not met or equaled [sic] the listings it was originally found to met [sic] and has not done so since at least April 15, 2003 (10F8, 13F4, 12F15). In march 2002, he had no restriction on his activities (10F11). The child was prescribed heart medications in December 2002, when he was 4 ½ years old, due to his cardiologist's belief that the symptoms of wheezing and shortness of breath with exercise being reported could be partially due to his cardiac condition (10F8). In June 2003, his cardiologist noted that he had come very well since the last evaluation with no chest pain (which prior reports of were felt by the doctor to have been musculoskeletal, not cardiac, in origin), with no significant illnesses apart from minor upper respiratory tract infections, with the child's mother reporting no specific limitations on his activities and the doctor's feeling that . . . the cardiac medications had improved his energy level slightly (10F5). In December 2003, the child did well on exercise testing (10F2). Dr. [Chris] Stefanalli, a treating cardiologist, stated in February 2006 that the claimant continued to do very well and participated in physical activities without any significant difficulty, with no complaints of increasing shortness of breath, chest pain, palpations or dizziness and had not been syncopal. Dr. Stefani [sic] commented that his cardiovascular status had been very stable, stating that he was allowed to participate in recreational baseball as long as he was in a position to self

limit his exertional activities (12F17). In June 2006, the claimant's reports to Dr. Stefanelli of general fatigue, easy fatiguability and becoming short of breath when running were followed up with exercise testing – the results similar to that of the previous year except for the increase in the gradient across the pulmonary range which was felt to suggest a possible ventilary limitation to exercise. However, the level of change was apparently not great as the claimant's activity limitations were not increased (12F8). While the claimant has some decreased exercise tolerance, it is not marked. Listings as they existed at the comparison pint of decision in 1998 have not been met or medically equaled since at least April 15, 2003.

The revised new cardiac listings have also been considered (Federal Register, January 13, 2006, Volume 71, Number 9) and the record does not to [sic] support that the claimant's condition meets a cardiac listing or any other listing now in effect.

None of the claimant's physicians have opined that either any former listing or any new listing has been met or equaled since April 15, 2003.

Tr. 19-21.

Plaintiff argues the ALJ erred in finding that he does not meet the criteria of Listing 104.06A4. To meet that Listing, a claimant must have "[c]ongenital heart disease, documented by appropriate medically acceptable imaging . . . or cardiac catherization, with . . . [c]yanotic heart disease, with persistent, chronic hypoxemia as manifested by . . . [e]xercise intolerance with increased hypoxemia on exertion." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B, § 104.06A4. Plaintiff also argues the ALJ erred in finding that he does not meet the criteria of Listing 104.02B, which provides in relevant part that a claimant must suffer from "[c]hronic heart failure while on a regimen of prescribed treatment, with . . . markedly decreased exercise tolerance." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B, §104.02B. The undersigned disagrees, finding the ALJ committed no error here.

As noted above, the ALJ found that although there was "no question" plaintiff has had "a long term cardiac condition" requiring him to take heart medications and undergo surgery in the future, his exertional problems were "not that of increased hypoxemia on exertion" or "exercise intolerance at the marked level" necessary for that condition to be found meet or medically equal the criteria of Listings 104.06A4 and 104.02B respectively. Tr. 20. While plaintiff argues he does suffer from such increased hypoxemia and exercise intolerance, the substantial objective medical and other evidence in the record does not bear this out. For example, in early March 2002, it was reported that although plaintiff complained of "occasional sharp chest pains," which primarily occurred in December 2001, he had "had no significant episodes of this nature since" January 2002. Tr. 334. In addition, those episodes were not accompanied by any shortness of breath, dizziness, syncope or palpitations. Id. The only incidence of shortness of breath noted

at that time was one associated with an ear infection, which resolved on antibiotics. Id.

Indeed, plaintiff was reported to be "active without limitations" and able to keep up "with his peers without difficulties." Id. Plaintiff's physician found him to be "doing well," feeling there was "[n]o need" for prescribing cardiac medications or imposing "restrictions on activities from a cardiac standpoint at the present time." Tr. 335-36. In late November 2002, it was noted that while "others" felt plaintiff possibly had wheezing, there was "no evidence" of this on examination. Tr. 313-15. Plaintiff reported he slowed himself down when feeling short of breath, and his mother stated his asthma was under control. Tr. 313; see also Tr. 266, 268. He also was observed "jumping around" without any respiratory distress. Tr. 314-15. In early December 2002, plaintiff was described as being "an alert, very active well-appearing child," in no acute distress. Tr. 311.

It was reported in late December 2002, that plaintiff had "developed some degree of shortness of breath while performing activities," and had "had more frequent bouts of wheezing." Tr. 331. However, he had experienced no "dizzy episodes of syncope" or palpitations. Id. In addition, while plaintiff was noted to still have "occasional episodes of chest pain," they were "not self-limiting." Id. Plaintiff, furthermore, had "been growing and developing normally," and his mother stated that when his respiratory symptoms were not present, his energy level was "excellent". Id. Although plaintiff's physician was "inclined to believe" that plaintiff's increased wheezing and shortness of breath might be "at least partially" due to his cardiac condition, again "[n]o restrictions on activities" were imposed. Tr. 332-33.

In early January 2003, plaintiff once more was observed to be "[i]n no distress, playing in the room before" his examination, which revealed no exertional limitations. Tr. 303-04, 307. His heart condition was found to be "stable" in late January 2003. Tr. 299-301. In early February 2003, plaintiff was noted to have no pain, shortness of breath or other symptoms that restricted his usual daily activities. Tr. 265. In early June 2003, plaintiff was reported to have "done very well," with "no further episodes of chest pain" since his late December 2002 examination, and with a slight improvement in his energy level. Tr. 328. Plaintiff's mother also reported that he was "doing well," that his "respiratory condition" had stabilized, and that there were "no specific limitations on his activities." Tr. 328-29. There also were no complaints of palpitations, dizziness or syncope. Tr. 328. There continued to be an absence of activity restrictions placed on him from a medical standpoint. Tr. 329. In late August 2003, plaintiff once more was described

as an "alert, very active, showing off child" in no acute distress. Tr. 294.

In early December 2003, plaintiff again was reported to be "doing well," both in general and more specifically in kindergarten. Tr. 325. While plaintiff was noted to continue "to have only fair energy level," and seemed "to limit himself when playing," he had had "no significant illnesses over the recent past," no dizzy spells, syncope, palpitations or tachycardia, and no further episodes of chest discomfort or pain. Tr. 325. Plaintiff also underwent a treadmill exercise test, in which he placed "at the 50[th] percentile for age and sex." Tr. 326. While plaintiff "discontinued exercise due to fatigue," he experienced no chest pain during the test, he had "normal" blood pressure and heart rate and response, and his physician stated that it seemed to be "a normal exercise treadmill test." Id.

That physician further commented at the time that although plaintiff had experienced symptoms of exercise intolerance, "he, in fact, exercised quite well," and "probably could have gone another minute or two," if the treadmill test had not been discontinued due to the physician's concern that plaintiff appeared "somewhat unstable on the treadmill device." Id. The physician further expressly stated that "[t]his was certainly due to his age as opposed to difficulty in exercising," that "[t]here were no specific concerns from the data of the treadmill exercise test," and that plaintiff's "post stress echocardiogram was reassuring." Id. Accordingly, the physician placed "[n]o restrictions" on plaintiff's activities, and did not believe him to be "a candidate for surgical intervention given his excellent performance today [on the exercise treadmill test] and the lack of progression by echocardiographic assessment." Tr. 327.

Plaintiff was noted to have "continued to do relatively well" in early June 2005, and to not have had "any significant medical illnesses" since early December 2004. Tr. 377. It is true that he also was reported to be participating in baseball and physical education on only "a limited basis," that he had "shortness of breath with running even short distances," and that he had had "an occasional complaint of dizziness." Id. On the other hand, he had not had complaints of chest pain, palpitations or a fast heart rate. Id. He further was found to look well in general and "happy as always," with non-labored breathing. Tr. 377-78.

In late August 2005, plaintiff "gave a good effort" during a cardiopulmonary exercise stress test done at the time. Tr. 375. He "exhibited a normal heart rate and blood pressure response" and performed "the expected amount of work," with "a normal peak oxygen consumption" and no chest pain, "indicating

very good functional aerobic capacity." Id. Activity restrictions were "basically self-limitations," although it was recommended that he "not be required to be involved in extreme exertional activities such as fitness testing and sustained running and should be allowed to rest when he" felt "the need." Id.

In late February 2006, plaintiff was noted to have "continued to do very well" since his examination in late August 2005. Tr. 371. It also was noted that he participated in physical activities "without any significant difficulty," had no complaints of increasing shortness of breath, chest pain, palpitations, or dizziness, and had not been syncopal. Id. His breathing was found to be non-labored. Id. Indeed, the physician who examined him at the time commented that he looked "great." Id. That physician further commented that plaintiff's "cardiovascular status" had been "very stable," and that "he should be fine to participate in recreational baseball as long as he" was "in a position to limit his activities should he feel any exertional symptoms of any kind." Tr. 372.

In mid-April 2006, plaintiff once more was noted to have "done relatively well" and be "relatively stable," although he still required activity restrictions. Tr. 370. Plaintiff underwent a physical examination in late June 2006, at which time his mother and grandmother reported that he had been "tired during the last couple of months," characterized by "general fatigue" and "fatigability with exertion activities." Tr. 367. They also noted that he was "becoming short of breath quickly" when running, and plaintiff himself reported that he was "having a harder time with activities," though he had not had any complaints of chest pain, palpitations, dizziness, or syncope. Id. On examination, however, his breathing was non-labored and his chest was clear. Id. In addition, while the physician who examined him was concerned about his "easy fatigability," there was "no significant change" in his echocardiogram "at rest." Tr. 368.

Plaintiff returned for a follow-up cardiopulmonary exercise stress test in late June 2006, in which he once more "gave a good effort throughout," with the test being terminated only "due to leg fatigue." Tr. 363. Again, plaintiff's heart rate and blood pressure response were normal, he had normal peak oxygen consumption and no chest pain, and, although his "breathing reserve" was found to be "somewhat low suggesting possible ventilatory limitation to exercise," nevertheless "good functional aerobic capacity" was indicated. Id. The physician at the time commented that "[b]asically this was a normal maximum graded exercise test with values similar to the study last year," and stated that activity restrictions remained self-limitations. Id.

As can be seen, while there have been reports of shortness of breath and fatigue at times, much of the objective medical evidence in the record establish that plaintiff generally has demonstrated sufficient aerobic capacity to participate in normal activities with only self-limitations imposed. More specifically, for the purpose of whether plaintiff's cardiac condition meets or medically equals Listings 104.06A4 or 104.02B, the objective medical and other evidence in the record does not show the presence of persistent, chronic hypoxemia, increased hypoxemia on exertion or markedly decreased exercise intolerance, but rather largely reveals the opposite. The fact that plaintiff has a diagnosed cardiac condition does not alone establish Listing-level severity as he appears to be arguing here.

Nor does the fact that plaintiff will require heart surgery in the future demonstrate disability. This is so, first because plaintiff's level of aerobic capacity, both with and without activity, as the record shows has resulted in conclusions by his physicians that conservative treatment measures are sufficient for the time being, and that heart surgery likely would not be required for as long as several more years. See, e.g., Tr. 327, 329, 332, 363, 370, 375, 385. Second, disability must be established on the basis of evidence in the record concerning plaintiff's past and current impairments and limitations, not what impairments or limitations he may be subject to in the future. Indeed, there is no evidence that future surgery will impose any further significant functional limitations on plaintiff, let alone ones that will meet or medically equal Listing-level severity or satisfy the duration requirements for establishing disability. Accordingly, for all of the above reasons, the undersigned finds the ALJ properly found plaintiff's cardiac condition did not meet or medically equal any impairments contained in the Listings.

III.   The ALJ Properly Found Plaintiff's Cardiac Condition Did Not Functionally Equal Any of the Impairments Contained in the Listings

If a claimant's impairment or impairments do not meet or medically equal any of those contained in the Listings, the Commissioner then determines whether his or her impairment or impairments functionally equal the Listings. 20 C.F.R. § 416.926a(a). To functionally equal the Listings, the claimant's impairment or impairments "must be of listing-level severity," i.e., they must result either in marked limitations in two domains or an extreme limitation in one domain. Id. In considering whether the claimant's impairment or impairments are functionally equivalent to the Listings, the Commissioner assesses what the claimant is unable to do, has difficulty doing, needs help doing, or is restricted from doing. Id. The Commissioner also "will assess the interactive and cumulative effects" of all of the claimant's impairments. Id.

The Commissioner will find a "marked" limitation in a domain if the claimant's impairment or impairments interfere "seriously" with the claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  A marked limitation also means "a limitation that is 'more than moderate' but 'less than extreme.'" Id.  Further, marked limitation will be found when the claimant has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning" in the particular domain, and the claimant's "day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(d)(2)(iii).

The Commissioner will find an "extreme" limitation in a domain if the claimant's impairment or impairments interfere "very seriously" with the claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An extreme limitation also is one that is "more than marked." Id.  As with a marked limitation, an extreme limitation additionally will be found if the claimant has "a valid score that is three standard deviations or more below the mean on a standardized test designed to measure ability or functioning" in the particular domain, and the claimant's "day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii).

With respect to the sixth domain, "[h]ealth and physical well-being," the Commissioner also may find the claimant has a marked limitation if the claimant is "frequently ill" due to his or her impairment or impairments, which result in "significant, documented symptoms or signs." 20 C.F.R. § 416.926a(e)(2)(iv).  The term "frequent" means:

> [E]pisodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more[,] . . . [or] episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

Id.  An extreme limitation in this domain may be found if the claimant is "frequently ill" because of his or her impairment or impairments, which "result in significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation" in 20 C.F.R. § 416.926a(e)(2)(iv). 20 C.F.R. § 416.926a(e)(4)(iv).

In determining whether a claimant has a marked or extreme limitation, the Commissioner "will not rely on any test score alone." 20 C.F.R. § 416.926(e)(4)(i).  That is, "[n]o single piece of information taken

in isolation" will establish that the claimant has a marked or extreme limitation in a domain. Id. Instead, the Commissioner will consider the claimant's "test scores together with" other information concerning the claimant, such as classroom performance and the observation of others. 20 C.F.R. § 416.926(e)(4)(ii). The Commissioner thus may find there is no marked or extreme limitation, even if the claimant's test scores are at the requisite level, if other information in the record shows that the claimant's "functioning in day-to-day activities is not seriously or very seriously limited." 20 C.F.R. § 416.926(e)(4)(ii)(B).

The ALJ found in this case that while the record supported a determination that plaintiff's cardiac condition was severe, the evidence contained therein failed to establish it functionally equaled a Listing. Tr. 24. Specifically, the ALJ found that although plaintiff had "some limitation" in the domain of moving about and manipulating objects – which was supported by evidence in the record of some restrictions on "exertional physical activities" – as well as in the domain of health and physical well-being, any such limitation was "at the less than marked level in both domains." Id. The ALJ further found no limitations in any of the other four domains of functioning. Id.

Plaintiff argues the evidence in the record shows he has a marked limitation in both of the above functional domains. No medical opinion source in the record, though, has found this degree of limitation. In late March 2003, Nevine Makari, M.D., a non-examining physician, opined that plaintiff had a less than marked limitation in the domain of health and physical well-being. Tr. 286. In early September 2003, Gene R. Profant, M.D., another non-examining physician, found a less than marked limitation in both this domain and the domain of moving about and manipulating objects. Tr. 321. Chris Stefanelli, M.D., who was plaintiff's treating cardiologist, concluded in late July 2006, that plaintiff had a moderate limitation in the domain of health and physical well-being. Tr. 358.

It is true that also in late July 2006, treating physician, Paul DeBusschere, M.D., found plaintiff to have a marked limitation in the domain of health and physical well-being, but, as pointed out by the ALJ, there must be a marked limitation in at least two domains of functioning to result in a finding of functional equivalency.[3] See Tr. 25. Plaintiff argues, though, that his cardiac condition seriously limits "his ability to

---

[3] Also as pointed out by the ALJ, Dr. BeBusschere found as well that plaintiff had a moderate limitation in the domain of caring for oneself, because of plaintiff's need to "respect his medical condition" and "slow down more often." Tr. 384. But as noted by the ALJ, Dr. DeBusshere gave "no indication as to any mental or emotional problems impacting his ability to care for himself" (Tr. 24), and, in any event, even if this opined limitation were to be credited, it still does not rise to the requisite level of severity to establish disability.

engage in playtime and activities typical for a ten year old." (Dkt. #10, p. 6). But, as discussed above, the only real restrictions on his activity level are those he chooses to impose himself, and a limitation on being able to fully participate in "extreme exertional activities" such as baseball, fitness testing or sustained running, which require a significant amount of aerobic activity. See Tr. 375. The ALJ, however, was not necessarily remiss in determining these limitations do not arise to a marked level of severity.

There is no indication in the record that plaintiff's self-imposed limitations prevent him from being able to participate in a wide range of daily activities on a regular and consistent basis. In addition, although certainly being restricted from engaging in extreme exertional or aerobic activities is a limitation, since, as just discussed, it appears plaintiff can still participate on a largely unrestricted basis in most other activities, the undersigned finds his ability to initiate, sustain or complete daily activities is not seriously compromised. Nor does the record establish for purposes of the domain of health and physical well-being that plaintiff has been "frequently ill" due to his cardiac condition. See 20 C.F.R. § 416.926a(e)(2)(iv). The record also does not indicate significant limitations in the task areas the domain of moving about and manipulating objects apparently covers, which is "[h]ow well the child moves his or her body from one place to another and how the child moves and manipulates things," i.e., "gross and fine motor skills." See Tr. 357.

Plaintiff focuses primarily on findings in the record that he has experienced wheezing, shortness of breath and fatigue, that he has been diagnosed with cardiac-related abnormalities, and that he will require further heart surgery in the future. As discussed above, however, the fact that plaintiff may require future surgery or has been diagnosed with certain medical impairments, does not in itself support a determination that his condition meets or medically equals a Listing. The same is true in regard to the issue of functional equivalency. In addition, also as discussed above, the substantial evidence in the record shows an ability to function and engage in physical activity that is not significantly, or at least markedly limited, by symptoms of wheezing, shortness of breath or fatigue.

Plaintiff argues as well that his "peculiar medical history" of having suffered infections, allergies, asthma, and gastric conditions, "suggest a weakened immune system or poor general health," which further supports a marked limitation in his physical well-being. (Dkt. #10, pp. 6-7). Again, though, the evidence in the record simply does not support a determination that these other health conditions rose to

the level of a marked limitation in that domain of functioning.  Indeed, in general, the record shows those conditions to be short-lived, with little impact on his overall health or ability to perform activities.  See Tr. 266, 268-69, 278, 313, 325, 328 331, 334, 377, 383.  While Dr. DeBusshere did opine in late May 2006, that plaintiff had "recurrent" ear infections and had developed asthma that further compromised his physical condition (Tr. 386), and commented in late July 2006, that he was "concerned about the combination of" plaintiff's asthma and "serious heart condition" (Tr. 385), he gave no opinion as to any specific functional limitations stemming therefrom, or as to exactly how plaintiff's physical condition was compromised.

Lastly, plaintiff argues he has a marked limitation in the domain of attending and completing tasks. That domain appears to concern how well a child is able to "focus and maintain attention," how well that child "begins, carries through, and finishes activities, including the pace at which" activities are performed, and "the ease with which the child changes activities." See Tr. 384.  Specifically, plaintiff asserts he is not capable of participating in many activities other children can, such as any long-lasting exertional tasks, and is limited in his ability to carry through or finish activities.  But other than activities requiring such long-lasting or extreme exertional aerobic output, the record fails to show he is limited in any significant way in his ability to initiate, carry through or finish other normal childhood activities.

Indeed, plaintiff points to no specific evidence in the record to support his assertion here.  Plaintiff also asserts there is "no doubt" that he cannot keep pace with his friends in many activities, but once more, he fails to point to any objective medical or other evidence as support therefor. (Dkt. #10, p. 7).  The same is true in regard to plaintiff's claim that "doctors" have informed his teachers and parents that he should not participate in activities at the same level as his peers. (Id.).  Again, the only extent to which this appears to be true, is with respect to high, sustained aerobic activity and those limitations plaintiff may choose to self-impose.  Nor has plaintiff demonstrated a reduced ability to focus and maintain attention. The undersigned thus finds plaintiff has failed to meet his burden of proof here as well.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was no longer disabled as of April 15, 2003, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **May 15, 2009**, as noted in the caption.

DATED this 21st day of April, 2009.


Karen L. Strombom
United States Magistrate Judge